Good morning, Your Honors. My name is Chris Karaguzov. I'm at the law firm of Dorsey & Whitney. We represent the appellant, Finicity Corporation, in this case, with me at counsel table is my colleague, Moral Shoei. I'm going to try to adhere to your advice with respect to timing. I'm also going to try to reserve a little bit of time for rebuttal. Very well. The primary question at issue in this arbitration is whether the timing, the content, and the nature of Finicity's disclosure of its terms and conditions on its disclosure page were sufficiently conspicuous to put the plaintiff on inquiry notice that with respect to sharing her bank account data with every dollar, which is the app that she was using, she would be bound to terms with Finicity. That's the central question. The court in Berman said that to answer the question of whether a disclosure was sufficiently conspicuous so as to put somebody on inquiry notice, there are two relevant issues that have to be examined, and you examine them together, not in isolation. The first is whether the visual elements of the notice of the terms are clear, sufficiently conspicuous, and the content of the transaction. And together, do those make it sufficiently conspicuous? There's a second prong in Berman that requires the consumer to also take some action, like clicking a button or checking a box, to manifest assent. I don't believe that's genuinely at issue here. The focus of the Court's decision below was really on the conspicuousness issue. The visual elements to support a finding of conspicuousness, which is the first prong, under this Court's precedence, Oberstein, Running Warehouse, a Patrick case, and Keebau. Mr. Kershoff, I guess we're talking about a lot of Ninth Circuit cases, and we've even framed this as a question of Ninth Circuit cases going all the way back. This is a question of California law. Where do you see the state of the doctrine from the California courts right now in these questions? What the Federal courts have been doing is interpreting California law. And if I look at Keebau, for example, and Patrick, which are the most recent cases interpreting California law, both of which were decided after the district court's decision in this case, the most salient aspects of that decision, at least as pertinent to this appeal, really have to do with the issue of context. And in particular, what the district court did in making its decision was to not consider the transactional context and the visual elements together. What it did is it thought that California law required it to look at the transactional context first. And if it didn't think that the transactional context supported it under California law, then it would not really consider the visual elements in totality. So why doesn't the context cut against you, given the most recent California state law guidance we have in Massage Envy? Yeah, a couple of reasons, Your Honor. First, let's just separate the two issues. I'll do Massage Envy in a moment, but first in terms of context. The central question here really is whether a consumer, an online user, is most apt to take notice of terms and conditions at the time at which they are presented with the action that is going to cause them to have to agree to those terms and conditions. So here, for example, in this case, plaintiff signs up for an app called EveryDollar. They sign up for that app whenever they sign up for it. It could be weeks before they then actually use the service, a phonicity service, which is bank connectivity. And it's at that point that the disclosure is made. And that is, contextually, the most relevant time at which to do it that is the time at which you are availing yourself of the service that really requires you to manifest assent. You could bury it in the terms and conditions with EveryDollar, but a plaintiff weeks before or whenever they happen to view those terms and conditions, if at all, is not going to pay attention to it in the same way that they are if they are confronted with those terms and conditions at the time of actual use. Well, I take your point as to the when, but what about the who? Yes. I mean, the disclosure here says share your PNC bank data. We use Phonicity, a MasterCard company. It might be ambiguous about whether we is EveryDollar or the user or PNC. Your Honor, this is a, and I will like to address your point in misogyny first, but since you've talked about the notice. Well, in part of misogyny is the who question. I absolutely understand. First, if you look, I agree that, of course, the disclosure says what it says. What it says, however, very clearly is, and you'll notice that it's full of branding by MasterCard, this sort of iconic MasterCard logo. The problem is the colors run together here with PNC, right? No, not really. I mean, the coloring for MasterCard is distinct, but let's see what it says. It says, by pressing next, I agree to Phonicity, a MasterCard company's terms and conditions and privacy policy. That's what it says. And with respect to misogyny, I would really encourage the Court to take a very hard look at the facts in misogyny, because the notion that it really turns on, you know, the who in terms of the third party is very narrow, in my view, because what that case really focused on was whether the consent or whether there was an agreement between the franchisor and the plaintiff in a circumstance where the notice itself telling folks whether to, you know, to sort of move on to the consent button if they were interested in learning more really was in reference to a general looking at it would have interpreted it to be between, in that case, the customer and the franchisee, the massage and the location to which the customer went. It wasn't until you clicked into that general consent, and I think as the Court held, many folks would not because they would think it was circumscribed by the description of what the general consent would contain, what you would be looking at if you clicked into it. It was only if you clicked into that that then you would see a separate click route with terms and conditions as it related to an agreement between the plaintiff and the franchisor. That is a very different scenario. It is, as the Court noted, there was subterfuge there. It was hidden. It's not so much — it is true that that happened to be a third party, but what the context was was that it was very hidden. Here, it is not hidden. It is being presented at the point at which you are going to use the service. And also consider that, in that case, both the context, that was really about whether somebody who claimed that they were a victim of a sexual assault was going to be forced to arbitrate with a party with whom she had no relationship and was not disclosed to her in a disclosure page. And again, the context, the subterfuge that the Court felt that the — that was engaged in. Also, the pressure that the plaintiff felt, because the plaintiff was basically given an iPad before she was going to go get her massage, and there were endless number of pages that she was sort of pressured to scroll through. So I would really encourage the Court to take a very hard look at the facts in Massage Envy. It's not — it's not because it was a third party. It was because of the subterfuge that was engaged in it. It was because of the description of the disclosure page, which was very different than the disclosure page that's at issue here. If I may turn back for a moment, just — and I'll go very quickly now to the visual elements. The visual elements of the page, and I'm not going to spend time on it, are clear. The disclosure is not cluttered. It's in close proximity to the action button, which a user — by which a user indicates assent to the terms. The disclosure uses different color text for the hyperlinks. And with respect to color, I want to be clear what the Selden Court said, which is it doesn't turn on what particular color is used — what color on the color wheel is used. What matters is if I'm looking at this disclosure, do I, in the totality of the circumstances, understand what is going on? And here, in this 51-page, uncluttered disclosure, it is hard for me to imagine that somebody who actually takes the time to look — and, of course, many of us do not. That is the reality. But if — but this is inquiry notice. If somebody takes the time to look, they should understand that there are finicities, terms, and conditions, that they have the — that they have the option to review them, and that by clicking the next button, they're consenting to them. Counsel, I had a — just a kind of a step-back question. What I mean is that when judges are asked to look at this question about whether the visual notice was sufficient or not, you know, when you look at a copy — I'm sorry, let's say at a trademark case, you have expert testimony to talk about, well, how this color is like that color or how this diagram is like this or like that. It seems like in these cases, we just — we're the judge and the jury. You're correct, Your Honor. If you look at all of the cases in which this arises, particularly when you're talking about enforcement of an arbitration provision, there's no expert testimony. You haven't gotten to that stage yet. And it's not required because, essentially, there is a body of jurisprudence now that talks about what kinds of visual elements matter and when — what kind of transactional context matters. And here, if you're looking at the totality of that, it supports a finding of conspicuousness. I guess I'm not — I understand your argument there. Of course. I'm just wondering, is there any authority that says that at this stage the trial court would actually bring in a jury or some sort of factual finder and — or is it reviewed for clear error or is it just straight de novo review? It's straight de novo review. And if you — and all of the decisions, it's straight de novo review. That's what I found. Yeah. I was just — anyway. It is. It's straight de novo review. It's up to the court. Just looking at the visual elements, I mean, moving on from the visual elements to the transactional context, I've — what happened is, in the lower court, is that it interpreted sellers to mean that for notice to be conspicuous, Phenicity had to engage plaintiff on the EveryDollar app when she first signed up for the account. And that was the same mistake that the lower court made in Keebaugh and that this court reversed. Here, it would not, as I said, have been more conspicuous to embed Phenicity's terms or to identify Phenicity when the plaintiff signed up for EveryDollar. It is much more conspicuous to do it at the time that they were about to avail themselves of the bank connectivity services that require assent to Phenicity's terms and conditions. And by the way, many people who use the EveryDollar app will not do that. In other means, will not use the services that require consent, because there are lots of services with Phenicity that the EveryDollar app provides. Second, the district court failed to consider the full context of the transaction because it ignored the repeated disclosures of Phenicity's involvement. The court said the plaintiff was expecting to enter into another set of terms with a different entity. It wasn't expecting that. Plaintiff could have had that belief. That's possible. But that necessarily changed once the disclosure page appeared and Phenicity was identified to the plaintiff. And the transactional context legal standard asks whether the circumstances made it reasonable to expect that the typical consumer in this type of transaction contemplates entering into a continuing forward-looking relationship. That's this. The transaction here is the timing of the notice was the most conspicuous possible because it happened right before the bank information was to be shared. The disclosure page makes it very clear that the user is dealing with Phenicity. A reasonable consumer is much more likely to be on the lookout for terms and conditions when they're about to share their personal bank information. The title, three of the four sentences on the disclosure page mention the user's financial data. The disclosure page is titled Share Your Bank Data. The first sentence says Phenicity, a MasterCard company. This transaction is, in fact, much more consequential than creating an online account or making a purchase online. The plaintiff purchased every dollar premium services for a year and was linking her bank account information in connection with those ongoing relationship that parties would be on the lookout for when they consider that when you look at the transactional context here. And third, and we've already discussed this, the district court, in our view, misapplied clearly distinguishable cases. I talked about misogyny earlier and some of the distinctions there, and we lay them out more fulsomely in the papers. But let's, you know, think about it this way. The district court thought that, you know, the fact that misogyny involved a click-wrap agreement, well, then, you know, if that involved a click-wrap agreement, then this one certainly can't be more conspicuous because it's a sign-in-wrap agreement. That's not how this works. A click-wrap agreement embedded within a separate click-wrap agreement with a different party is not more conspicuous because it's a click-wrap agreement. There are lots of cases in this Court in which click-wrap agreements have been upheld or not. Sign-in-wrap agreements have been upheld or not. It's not the function. It's not the label of the agreement. It's really, again, whether it's conspicuous. And lastly, and perhaps I think most importantly, the Court erred when it treated the transaction context analysis as dispositive of the first prong of the Berman test regarding conspicuousness. Again, for the reasons I just explained and are more fully set forth in our papers, the transaction context supports a finding of conspicuousness. But regardless, Keebaugh and Patrick, which, again, the district court didn't have the benefit of when it issued its decision, made clear that the court has to consider the transactional context and the visual elements together. And if — just lastly, because I know I'm running out of time, I'd like you to just think about the policy considerations for one moment here, because it would mean that any company that necessarily operates in the background of consumer transactions would have to use a click-wrap agreement, as the Court suggested during oral argument. And there are a couple of problems with that. One, it's not the law. Berman says courts have to focus on the conspicuousness of the notice, not the label of the online Keebaugh was a sign-in wrap agreement. That was enforceable. So you have to consider the context. And it's going — if you — if the Court doesn't uphold it, it's going to invite new lines of inquiry into the level of involvement of third parties that would be far more complicated and far more difficult to resolve than just analyzing the visual elements of the notice and the transactional context. Your Honor indicated before, gee, we need an expert. How are we going to do this? Or is it just de novo? Is that what we do? That is. Imagine how much more difficult it would be if you also had to start analyzing the level of connectedness with a third party. All right. I'm going to — we're over. I'll give you one minute for rebuttal. Thank you. I appreciate it, Your Honor. But thank you for your argument. Thanks very much. Good morning, Your Honors. May it please the Court. I'm Judge Stephan Bigdanovich, appearing on behalf of Plaintiff Appley, Kate Wilmots. This is not your typical sign-and-wrap case. This is a signed-up, paid-for, back-behind-the-paywall, clicking-next-to-retrieve-a-service-I'd-already-paid-for wrap case. Judge Johnstone, as you mentioned, this case turns on California law. And the cases that have addressed similar contextual circumstances are all in accord, involving click-wrap agreements with various colored hyperlinks. They noted that those terms were not reasonably conspicuous. So I understand your argument that, you know, you already entered into an agreement. And so, you know, clicking on this later, there's no consideration. But is your position that you could never, once you've entered into agreement, have – or is your position that you could, but this is not sufficient? And if it's the latter, what would be an example of something that would work? Thank you, Your Honor. No, our position is not any kind of bright-line rule that there can't ever be a potential circumstance where there's – You've already entered into a contract, and later on you click and agree to some terms. Correct. There's an infinite number of ways, you know, providers can design their websites. So what would be something that would work, in your view? It's hard to say. I don't think that's necessarily a question that the Court needs to decide today. But there's a lot of stronger forms of notice, like a scroll-wrap agreement, where you actually have all the terms in a pop-up and you have to scroll down to the bottom, click I agree. Mr. Bogdanovich, I guess – I think your friend suggests that one way to comply with this would be to bury the agreement with Vinnicity in the agreement with the EveryDollar app. How does that make it more conspicuous that you're entering into an arbitration agreement with a third party? I think that particular scenario is a little bit different. I think there the timing is better, although I think the disclosure might be worse, because if you include it on the EveryDollar sign-up page within a second step, that would be less conspicuous than even the disclosure that we have here, where they have the hyperlink to Vinnicity's terms on the page. I think you could disclose it on the EveryDollar sign-up page, where it says, by signing up, you agree to Ramsey Solutions terms of use and also Vinnicity's terms of use if you use the bank connectivity service. But again, what we're not advocating here for necessarily is a bright-line rule, while there might be some utility in announcing one for website designers. I think this court can rest its decision on the fact that in Sellers, in MassageMV and in Herzog, you had click-wrap agreements, you had different colored hyperlinks, and that was not reasonably conspicuous. And so comparing the visual elements of those cases to this case, you can find that the terms here didn't pass muster. Another kind of one of the points that my friends on the other side mentioned is it could be weeks later that you would even try to connect your bank account after you signed up for the EveryDollar app. I actually think that undermines their argument. Judge Owens, I know this court looked at kind of a similar case in Stover v. Experian, where a user had used the Experian service years later. And in that case, it also involved a hybrid wrap agreement. And the court noted that the relevant inquiry here is whether or not the parties are agreeing to the same thing in the same sense. And so even though the user had logged in later, the terms were not the same. The terms had changed. And the court noted that it actually needs to be the change. The notice turns on whether or not the consumer knows that there's necessarily a change in the terms. So again, here, when we look at how does a consumer interact with the terms, with Finicity's terms, I should say, they've already signed up for an EveryDollar account. They've given over their debit card information to pay for an account, to sign up for a subscription. Now they're just simply seeking to access the service that they've been paying for. And they come up on a screen after they've clicked PNC, and the title of the page says, Share Your PNC Bank Data. As Judge Johnstone noted, there's a lot of questions here as to what exactly is the party agreeing to. Are they agreeing to PNC? Are they agreeing to EveryDollar? Are they agreeing to Finicity? And so in that kind of a context, any kind of disclosure, the website provider needs to go above and beyond to make it much more conspicuous. So again, I'd note that this case is probably most factually similar to the three cases, the California Court of Appeals cases I mentioned. I'd also note this isn't necessarily a peculiar issue of California law. I do think it's consistent with the Ninth Circuit's precedent. In Lee v. Tellius, this court decided almost a decade before that under similar factual circumstances that where a user was accessing a background check report that they'd already paid for, the court expressed a lot of skepticism as to whether or not they can objectively manifest dissent to another third party's terms and conditions. When they clicked a yes and show my report button, because again there was another third party involved. It was after the consumer had already paid for the product and the court noted that even the exceptionally cautious consumer that is on the lookout for any kind of differences might not necessarily catch that. Mr. Bogdanovich, I guess I have a slightly different question that colors our approach to the facts here and it was prompted by Judge Owen's lines of questioning and your friend. The district court in analyzing whether there was, we have these questions about these seem to be essentially kind of questions of fact that maybe expert testimony could help with. The district court, I believe, thought it was applying a kind of summary judgment standard that had been dictated by Section 4 of the FAA, which talks about a summary trial and I think is reflected in at least some of our cases though not those at issue here. The Hansen case, for example. If that's the case, why aren't you asking us to review this instead of de novo, review the factual underpinnings in the light most favorable to the non-moving party? What is the right standard of review here? Well, I believe under this court's prior precedence, it would be de novo. Well, de novo as we've said that, but I can't tell whether when we've said that we're talking about the legal conclusions rather than the factual underpinnings, which again I think we've clearly said Section 4 requires us to treat as a motion under summary judgment standards. I think that's an interesting question. Perhaps if there was a closer call, maybe it would rise to the level of necessarily a jury question. I do think the summary judgment standard seems appropriate. In Hansen, that also involved a hybrid wrap agreement, so I think that would be similar to what we have here. However, again, looking at prior precedence under California law, I think in those cases the visual elements were better than they were here, and so I think just as a matter of law, the textual notice was not reasonably conspicuous, and so the court can make that determination for itself as the district court did below. In other cases, perhaps the court could reach a different conclusion. The last thing I just wanted to note, again, in terms of context, I think this case, if we were to translate it to the modern-day world, I think it's very similar to, say, purchasing a burger at Burger King. You go to the cashier, you give them your credit card, you pay for the burger, and then you're waiting to receive the burger. They call your number, you pick up the burger, and on the wrapper of the burger it says, by unwrapping this burger, you agree to the company's terms and conditions. I think in a circumstance like that, most folks would say they're not on the lookout for any kinds of terms and conditions on the wrapper. What they're on the lookout for is just the burger so that they can enjoy it, and I think... Does every customer of every dollar use the financial transfer services of Finicity? We don't know. It's not necessarily in the record. But why would... Why isn't it appropriate for every dollar and Finicity to tailor its entry into this additional agreement only to those customers who are going to use it? I think... I think it's because Finicity's the one that's seeking to impose the contract of adhesion, so they have... They're in a better position to make sure that there's a meeting of the minds here. In terms of... Even in terms of that particular context, they have a business relationship with every dollar, and so they can contract with them and help work in the... Essentially help them design the sign-up page to make sure that consumers are adequately informed. Unless the panel has any further questions... All right, thank you, counsel. Thank you. One minute. Thank you. I just want to address two things very quickly. One, with respect to the argument that, well, they've already paid for a service, so why should they be asked to consent to anything? First of all, we do that all the time in everyday life. You get terms and conditions updated all the time for things you've already paid for, and if you don't agree to them, you're not going to be able to use them. Anyone who owns an iPhone knows that. Secondly, if we don't want... If folks don't want to accept Finicity's terms, she could have, A, just used other premium access services, or she could have canceled her subscription. Her purchase didn't force her to accept Finicity's terms, and a case on point for this is McDaniel, where somebody had purchased, through the Amazon app, a subscription to HBO Max, and then they had to agree to HBO Max terms and conditions, and what the court there said is a plaintiff had the option to reject the terms and cancel the subscription, and that's something that could have easily happened here. And lastly, with respect to the notion that folks are confused or whatever, I really think, again, if you look at the notice, that infantilizes consumers. This is not a difficult notice to read. When it says, click next, you're agreeing to MasterCard's terms and conditions, that's what it says, and I think we need to stop infantilizing consumers by pretending that language that is clear is not clear. Thank you, Your Honor. Thank you, counsel. Thanks to both of you for your briefing and argument in this case, very helpful. This matter is submitted.
judges: OWENS, VANDYKE, JOHNSTONE